IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAΓI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 08-00577  DAE |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| STEPHEN SWIFT,      [02] | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER DENYING DEFENDANT'S MOTION
TO SUPPRESS EVIDENCE AND STATEMENTS

On November 7, 2009, the Court heard Defendant's Motion.  Marshall

H. Silverberg, Assistant U.S. Attorney appeared at the hearing on behalf of

Plaintiff; Dana S. Ishibashi, Esq., appeared at the hearing on behalf of Defendant.

After hearing on the  motion and reviewing the supporting and opposing

memoranda, the Court **DENIES** Defendant's Motion.

BACKGROUND

The Court repeats the background facts only as is necessary for a

decision on Defendant's Motion to Suppress Evidence and Statements ("Mot.,"

Doc. # 67) in the discussion section below.  The facts were supplemented by the

Government through testimony at the December 7, 2009 hearing ("hearing").

On or about September 26, 2005, via a quitclaim deed (Opp'n, Ex. 1), Lily Galapon ("Galapon") became the legal owner of a parcel of land, approximately 10.848 acres in size, located at 85-1533 Haleahi Road, TMK No. (1) 8-5-004-057, in Waianae, Hawai'i (the "Waianae property"). The quitclaim deed was recorded in the Land Court on November 9, 2005. (Id.) The Waianae property is undeveloped. (Opp'n at 2.)

On or about September 10, 2007, Galapon executed a mortgage with House of Finance, Inc., in the principal sum of $185,000, secured by the Waianae property. (Id., Ex. 2.) On October 30, 2007, Defendant filed a civil action in the First Circuit Court of the State of Hawaii. (Id., Ex. 3.) Defendant stated that he had a "constructive trust" in the Waianae property and that he should have received a portion of the mortgage proceeds that Galapon received from House of Finance. (Id., ¶¶ 13-15, 20.) According to a handwritten notation on the complaint, which the Government believes was written by Galapon, Galapon was served with Defendant's Complaint on November 14, 2007. (Id., cover page.)

On November 15, 2009, Galapon's broker, Les Hirahara ("Hirahara") and Curtis Crabbe ("Crabbe") met with Grace Simmons ("Simmons") of the State Department of Health ("DOH"). (Mot., Ex. A.) Hirahara and Crabbe informed Simmons that there was waste on the Waianae property. (Id. at 1.) Hirahara,

acting under the authority of Galapon as broker, gave the DOH authorization to

enter the property.  (Id.)  Simmons followed up by calling Galapon and requesting

oral and written authorization to search the property and the containers, which she

received.  (Hearing, testimony of Grace Simmons & Ex. 12.)

On November 16, 2007, DOH investigators, along with Special Agent

Donna Kahakui ("Special Agent Kahakui") of the U.S. Environmental Protection

Agency ("EPA"), entered the Waianae property without a warrant pursuant to the

authorization from Galapon. (Opp'n , Ex. 4.)  On the Waianae property, the

investigators found three containers, including a red Matson container.  (Id.)  The

containers were unlocked and the doors to the two white containers were partially

open.  (Hearing, testimony of Grace Simmons.)  DOH Specialist Alphonese Allen

entered each container, inventoried the items, and took photographs.  (Opp'n , Ex.

4.)  The hazardous waste that is the subject of Defendant's criminal prosecution

was contained in a red Matson container found on the Waianae property.  (Opp'n

at 3.)

On January 4, 2008, the DOH sent counsel for Defendant a letter

informing Defendant that the DOH had reason to believe that he had knowledge

regarding, and may be responsible for, the dumping of hazardous waste and used

oil at the Waianae property.  (Mot., Ex. B.)  The letter requested that Defendant

respond to the questions contained therein or face "a civil penalty of up to $10,000 per day." (Id.)  Defendant responded to the DOH's request by letter dated January 21, 2008.  (Mot., Ex. C.)

On January 29, 2008, Galapon filed an Answer to Defendant's First Circuit Court of the State of Hawaiʻi lawsuit.  (Opp'n, Ex. 7.)  On October 30, 2008, the Circuit Court of Hawaiʻi dismissed Defendant's lawsuit.  (Id., Ex. 8.)

On May 11, 2008, Special Agents Gary Guerra and Jan Valenti of the EPA ("EPA Special Agents") interviewed Defendant.  (Mot., Ex. D.)  Defendant was not provided Miranda warnings.  (Id.) Defendant on his lanai (balcony) during the interview and not under arrest.  (Mot., Ex. D; Opp'n, Ex. 10.)

On June 17, 2009, Galapon deeded over the Waianae property to Robert Swift, from whom she had obtained it in 2005.  (Id., Ex. 9.)

On September 24, 2008 a federal grand jury returned a five-count indictment against Defendant and co-defendant Jerome "Jerry" Anches.  Defendant was charged with four counts including: (2) causing the transportation of hazardous waste without manifest and aiding and abetting the same, in violation of 42 U.S.C. § 6928(d)(5) and 18 U.S.C. § 2; (3) causing the transportation of hazardous waste without manifest, in violation of 42 U.S.C. § 6928(d)(5); (4) storing hazardous waste without a permit and aiding and abetting the same, in

4

violation of 42 U.S.C. § 6928(d)(2)(A) and 18 U.S.C. § 2; and (5) mail fraud, in

violation of 18 U.S.C. § 1341.  (Doc. # 1.)  On September 30, 2008, Defendant

entered a plea of not guilty.  (Doc. # 8.)

On November 9, 2009, Defendant filed a Motion to Dismiss Count 5

of the Indictment.  (Doc. # 66.)  On November 23, 2009, the Government

responded consenting to a dismissal without prejudice of Count 5.  (Doc. # 70.) On

December 12, this Court granted without prejudice Defendant's Motion to Dismiss

Count 5 of the Indictment.  (Doc. # 73.)

On November 9, 2009, Defendant filed the instant Motion to Suppress

Evidence and Statements.  (Doc. # 67.)  On November 24, 2009, the Government

filed a Memorandum in Opposition to Defendant's motion.  (Doc. # 71.)

<u>DISCUSSION</u>

Defendant argues that the contents of the red Matson container should

be suppressed because the DOH and EPA lacked authority to search the container

under the Fourth Amendment.  (Mot. at 5-6.)  Defendant also argues that

statements made by Defendant to the EPA should be suppressed because

Defendant's statements were made without the benefit of <u>Miranda</u> warnings.  (<u>Id.</u>

at 6-7.)

I.      Search of the Waianae Property and Containers

Pursuant to the Fourth Amendment, all state-initiated searches and

seizures must be reasonable and generally require a warrant in order to be valid.

United States v. Hawkins, 249 F.3d 867, 872 (9th Cir. 2001).  The Fourth

Amendment ensures:

> The right of the people to be secure in their persons, houses, papers,
> and effects, against unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly describing the place
> to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  However, there are established exceptions to the warrant

requirement.  Hawkins, 249 F.3d at 872.   The burden of proof rests on the

government to justify the search under one of the exceptions to the warrant

requirement.  Id.  If the government fails to meet this burden, the exclusionary rule

generally prohibits the introduction of the evidence at trial.  See Elkins v. United

States, 364 U.S. 206, 221-22 (1960).  One of these specific exceptions to the

warrant and probable cause requirements of the Fourth Amendment is that a search

conducted pursuant to a valid consent is constitutionally permissible.  United States

v. Henery, 615 F.2d 1223 (9th Cir. 1980) (citing Schneckloth v. Bustamonte, 412

U.S. 218, 219 (1973)).  Illegally obtained evidence and all evidence derived from

the illegally seized evidence must be excluded.  Wong Sun v. United States, 371

U.S. 471, 484-85 (1963); <u>United States v. Patzer</u>, 277 F.3d 1080, 1086 (9th Cir. 2002).

    A.    Actual Authority to Search the Waianae Property

       Defendant does not argue that the DOH and EPA did not have consent from Galapon to search the Waianae property.  Instead, Defendant argues that he was the "tenant" of the Waianae property and that the containers on the property should not have been opened without a search warrant.  (Mot. at 6.)  In support, Defendant asserts that even though Galapon "was the owner [of the Waianae property ] pursuant to a quit claim deed issued by Swift's brother, Galapon paid no money for the deed and Swift was responsible for the mortgage payments."  (Mot. at 6.)

       One who is not the owner, lessee, or lawful occupant of the premises searched does not have a right to assert unlawful search and seizure under the Fourth Amendment.  <u>Kwong How v. United States</u>, 71 F.2d 71, 75 (9th Cir. 1934); <u>See</u> <u>also</u> <u>Cutting v. United States</u>, 169 F.2d 951 (9th Cir. 1948) (permission by owner to search premises and seize property contained thereon was valid when the defendant did not live on the premises); <u>Von Eichelberger v. United States</u>, 252 F.2d 184, 186 (9th Cir. 1958); <u>see</u> <u>also</u> <u>Raine v. United States</u>, 299 F. 407, 411 (9th

Cir. 1924) (consent to search by person left in charge of premises by owner held lawful);

In <u>Von Eichelberger</u>, the defendant had transferred possession of firearms to a second individual who stored the firearms on premises under the control of a third individual.  <u>Von Eichelberger</u>,  252 F.2d at 186.  The third individual provided consent to government agents to search of the premises.  <u>Id.</u> The Ninth Circuit held that because neither defendant nor the second individual were lessees or owners of the premises searched or its lawful occupants, neither had Fourth Amendment rights in the premises, even where the second individual had limited storage rights.  <u>Id.</u>

Defendant cites cases supporting the proposition that a landlord may not consent to the search of a tenant's home for Fourth Amendment purposes.  <u>See</u> <u>Chapman v. United States</u>, 365 U.S. 610, 617 (1961).  However, Defendant cites no law supporting the assertion that someone who makes mortgage payments on someone else's undeveloped property has a tenancy in that property or may be considered a lawful occupant.

Moreover, Defendant provides no documentation that he has a lease agreement or contract with Galapon, that he was in anyway legally responsible for the mortgage payments, or that he was in fact paying the mortgage payments.

8

From the undisputed facts, it is Galapon who held sole legal title to the property and executed a mortgage on the property at the relevant time in question.  (Opp'n, Ex. 1 & 2.)  Although it was Galapon and Defendant's oral understanding that Defendant would pay the mortgage, from her testimony, Galapon made one or two mortgage payments and believed that she was not just the legal owner of the property, but the rightful owner because Defendant failed to continue to make mortgage payments as required by their unrecorded oral agreement.

Further, the fact that Defendant paid the mortgage on the Waianae property at one point does not make the Defendant a tenant in the commercial or residential sense because he had neither a possessory interest in the property nor a lease agreement with Galapon.[1]  See HRS § 521-8 ("'Tenant' means any person who occupies a dwelling unit for dwelling purposes under a rental agreement."). Moreover, as made clear from the hearing, it was Galapon's name on the mortgage and when the loan went in to default, it was Galapon's credit that suffered and Galapon that was left with the consequences of pending foreclosure.   In further support, Galapon testified that at the time the EPA Agents entered the property,

---

[1] Defendant did not claim to be a tenant when he filed an action against Galapon in the First Circuit Court of the State of Hawai'i.  Instead, he argued that he had a "constructive trust" in the mortgage proceeds.  (Opp'n, Ex. 3 ¶¶ 13-15, 20.) Defendant does not make this latter argument in the instant motion.

Defendant did not have a key to the lock around the gate, necessary in order to bring a vehicle on the land.

Defendant was not a tenant or owner of the premises searched or a lawful occupant of the premises, and therefore cannot argue that the DOH and EPA agents' search was unlawful under the Fourth Amendment.  Galapon was the legal owner of the Waianae property, and her oral and written consent was effective to allow lawful search.[2]

B.     Authority to Search the Containers

To show the government has violated his Fourth Amendment rights, an individual must have "a legitimate expectation of privacy in the invaded place." Crawford, 323 F.3d at 706 (internal quotation marks and citations omitted).  A third party's consent to the search of another's belongings is valid if the consenting party has either actual or apparent authority to give consent.  United States v. Davis, 332 F.3d 1163, 1169 (9th Cir. 2003).

1.     Expectation of Privacy

In order to show a legitimate expectation of privacy, a defendant must demonstrate, under the totality of the circumstances, "a subjective

_____

[2] Even if Defendant had some interest in the land, Galapon also clearly had apparent authority to consent to the search of the property.  The Court further discusses Galapon's apparent authority, supra, with respect to the containers.

expectation of privacy in the area searched, and their expectation must be one that society would recognize as objectively reasonable." <u>United States v. Sarkisian</u>, 197 F.3d 966, 986 (9th Cir. 1999).  The shared control of "host" property does not serve to forfeit the expectation of privacy in containers within that property. <u>United States v. Welch</u>, 4 F.3d 761, 764 (9th Cir. 1993) (citing <u>United States v. Karo</u>, 468 U.S. 705, 725-27, (1984) (O'Connor, J., concurring)).  "A person has an expectation of privacy in his or her private, closed containers" and "does not forfeit that expectation of privacy merely because the container is located in a place that is not controlled exclusively by the container's owner." <u>United States v. Fultz</u>, 146 F.3d 1102, 1105 (9th Cir. 1998) (finding defendant had reasonable expectation of privacy in cardboard boxes stored in another person's garage); <u>see</u> <u>also</u> <u>United States v. Welch</u>, 4 F.3d 761, 764 (9th Cir. 1993) (finding defendant had reasonable expectation of privacy in her purse left in a rental car).

An abandonment by the owner or possessor of property ends his reasonable expectation of privacy.  <u>United States v. Sledge</u>, 650 F.2d 1075, 1080 (9th Cir. 1981).  If one who has abandoned property from all outward appearances in fact has retained a subjective expectation of privacy, then a search of the property is nevertheless valid if that expectation is intrinsically unreasonable or not otherwise entitled to protection.  (<u>Id.</u>)

11

Defendant did not have a reasonable expectation of privacy in the containers.  Hirahara testified that from the outside of the Waianae property, it is difficult to see what is on the property.   However, although the contents of the containers were concealed from outside view, the containers themselves were in plain sight on the undeveloped, cleared property of Galapon.  Further, although there was a gate and a rock wall around the property, Simmons testified that a key was not necessary for entry by foot as there was space on the side to walk around the gate.  (See also Hearing, Ex. 12.)

The red Matson container in question was unlocked and there was testimony to the effect that all three containers' doors were left open and unattended at various times prior to the search.  No notice was placed on the containers to give warning that anyone besides the property owner had a possessory interest in the containers or their contents.  (Opp'n, Ex. 4, 5.)

Moreover, the facts show that the containers were abandoned by Defendant on the Waianae property.  From testimony and photographs it is clear to the Court that the property was used, at least partially, as a place to dump construction debris and materials.  (See Hearing, Ex. 13.)  At the hearing, Craig Akamine testified that he was hired in 2007 by Galapon and Hirahara to "clean up" the property, including removing debris from the property.  Akamine knew

12

Defendant and knew that Defendant had some connection to the property and had items stored on the property.  Accordingly, Akamine informed Defendant that he needed to come and get his belongings off the property.  Defendant complied and removed some items, but left all three containers.  Akamine testified that the doors to the red Matson container were wide open on the occasions that he visited the property.  Akamine did not remove the containers because of their potentially hazardous contents.  Had the containers not contained what appeared to be paint and other potentially hazardous materials, Akamine could have hauled them away and disposed of them.  Clearly, Defendant was aware of this when he removed the other items from the property at Akamine's urging but chose to leave the containers for Akamine to deal with.

The facts fail to even show that Defendant exercised any sort of proprietary interest in the containers.  Moreover, Defendant knew that Galapon was the legal owner of the property and that she had a possessory interest in the property demonstrated by her actions to clean up the property and her placement of a lock on the gate to which Defendant did not possess a key.

For all the reasons above, Defendant did not have an expectation of privacy in the containers.  Additionally, if Defendant ever had a possessory interest in the containers, Defendant's actions show that he abandoned

13

the containers on the Waianae property.  Accordingly, the DOH and EPA's search

of the containers without a warrant was valid.

       2.    Actual Authority

      Preliminarily, apparent abandonment, as in this case, ended any

expectation of privacy Defendant may have had in the containers and conferred

upon Galapon authority sufficient to authorize consent to the DOH investigators'

search.  Sledge, 650 F.2d at 1080.  Furthermore, Galapon had actual authority to

consent to search of the containers.  The effect of Defendant leaving the containers

on property legally owned by Galapon was that Defendant ceded authority over the

containers, either partially or totally, to Galapon.  See United States v. Kim, 105

F.3d 1579, 1582 (9th Cir.1997).

      Defendant assumed the risk that Galapon, as the legal owner of

the Waianae property and apparent owner of the containers, could give consent to

law enforcement officials to search the property or the containers.  See United

States v. Matlock, 415 U.S. 164, 171 (1974); United States v. Davis, 967 F.2d 84,

88 (2d Cir. 1992) (defendant assumed risk that friend would consent to search

because friend retained joint control over footlocker); Kim, 105 F.3d at 1582

(defendant assumed risk that third party would consent to search of storage locker,

where defendant instructed third party to rent locker under third party's name and

allowed third party to keep possession of lease papers and to occasionally retain the keys).

Here, the containers were on Galapon's property, she had the only key to the gate, and Defendant knew from Akamine that Galapon was attempting to clean up the property and even assisted by removing some of his belongings, but failed to remove the containers.  It is certainly reasonable to assume that if you abandon containers on another's property that they will "check out" the containers' contents.  Therefore, Defendant clearly assumed the risk that Galapon would consent to search and/or removal of the containers from her land. For all the reasons above, even if Defendant had an expectation of privacy, Galapon had actual authority to consent to the search of the containers.

3.    Apparent Authority

An officer may rely on a person's "apparent authority" to consent to the search if the reliance is in good faith and reasonably based on all facts known to them at the time of the search.  See Illinois v. Rodriguez, 497 U.S. 177, 181 (1990); United States v. Enslin, 327 F.3d 788, 794 (9th Cir. 2003) (officers' belief that homeowner had authority to consent to search of room was reasonable because officers had no reason to believe homeowner was renting room to defendant); United States v. Ruiz, 428 F.3d 877, 882 (9th Cir. 2005) (in the

cases in which [the Ninth Circuit has] held that there was not actual or apparent authority for a third party to consent to a search [the Ninth Circuit has] found that there was some fact that made it unreasonable for the officer to believe that the third party had authority over the container).

Galapon had apparent authority to consent to the search of the containers.  It was reasonable for the DOH investigators and EPA Special Agent to believe that Galapon had authority and control over the containers.  The containers were on Galapon's property, and Galapon specifically directed Hirahara and Crabbe to approach the DOH regarding their contents.  At the hearing, Simmons testified that she followed up on her meeting with Hirahara and Crabbe by contacting Galapon directly as the owner of the Waianae property.  Galapon verified for Simmons that she was the owner of the Waianae property and gave the DOH oral and written permission to search the property and the containers. (Hearing, Ex. 12.)  Therefore it was reasonable for the DOH to believe that Galapon had authority and control over the Waianae property and the containers thereon.

Additionally, it was reasonable for the DOH to believe that the containers were dumped and abandoned by Defendant.  Simmons testified that at the time of the search she believed the containers to be abandoned on Galapon's

16

property.  At the hearing, defense counsel argued that the containers could have

been thought by DOH to be stored by someone, possibly Defendant, on the

property.  Defense counsel also argued that Crabbe told Simmons in the November

15, 2009 meeting that the containers were the property of Defendant.  Although the

DOH could have believed that Defendant was storing the containers on Galapon's

property, Defense counsel's theory is not supported by the evidence.

As testified to by Simmons, the Waianae property appeared to be a place to

dump construction materials.  (Hearing, Ex. 13.)  As stated above, the doors on

both white containers were partially open so that the investigators could see inside

to the contents, and although the door to the red Matson container was closed, the

container was unlocked.  Simmons also testified, and documented during the

interview, that Crabbe informed the DOH that Defendant had transported the

containers to the property, not that Defendant was the owner of the containers.

From the facts as presented to the DOH, it was reasonable for

the DOH investigators or EPA Special Agent Kahakui to believe that the

containers were abandoned or dumped after they were transported by Defendant.

This belief is supported by the DOH's own January 4, 2008 letter to Defendant

wherein the DOH asks whether Defendant dumped the containers at the Waianae

site, and if not for the names of the alleged dumpers.  (Mot., Ex. C at 2.)  The DOH

investigators and EPA Special Agent had no indication that Galapon was anything

other than an innocent owner of the property on which containers were abandoned.

The undisclosed facts known to Galapon and Defendant are not relevant to the

inquiry of apparent authority.  Therefore, it was reasonable for the DOH to believe

that the containers were abandoned and left for disposal and that Galapon therefore

had authority to consent to search of the containers.

        For the reasons above, Galapon had both actual and apparent

authority to consent to the DOH and EPA's search of the containers.  Moreover,

Defendant did not have a reasonable expectation of privacy in the containers and

abandoned them on the Waianae property.  Accordingly, the Court finds that

search of the Waianae property or the containers did not violate Defendant's

Fourth amendment rights.  The Court DENIES Defendant's motion to suppress the

contents of the red Matson container.

II.    <u>Applicability of Miranda Warnings to Defendant's Interview</u>

        Defendant next argues that the statements he made in his January 21,

2009 letter to the DOH and statements made to two EPA Special Agents on May

11, 2008 should be suppressed because Defendant was not provided <u>Miranda</u>

warnings prior to making the statements.   (Mot. at 6-7.)

The warnings required by <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966),
apply to custodial interrogations, meaning "questioning initiated by law
enforcement officers after a person has been taken into custody or otherwise
deprived of his freedom of action in any significant way." <u>Id.</u> at 444. <u>Miranda</u>
warnings must be administered:

> only where there has been such a restriction on a person's
> freedom as to render him in custody. Whether a suspect
> is in custody turns on whether there is a formal arrest or
> restraint on freedom of movement of the degree
> associated with a formal arrest. This inquiry requires a
> court to examine the totality of the circumstances from
> the perspective of a reasonable person in the suspect's
> position.

<u>Crawford</u>, 372 F.3d at 1059 (internal quotation marks, citations, and alterations
omitted). Two discrete inquiries are essential. First, "what were the circumstances
surrounding the interrogation," and second, "given those circumstances, would a
reasonable person have felt he or she was not at liberty to terminate the
interrogation and leave." <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995).

Factors relevant to a custody determination include (1) the language
used by the officers, including the language used to summon the individual; (2) the
physical surroundings of the location where the questioning occurs; (3) the extent
to which the suspect is confronted with evidence of guilt; (4) the duration of the

19

detention; and (5) the degree of pressure applied to detain the individual.   United

States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001).  Other factors may

be relevant or even dispositive of the inquiry; these five factors "are simply ones

that recur frequently."  United States v. Kim, 292 F.3d 969, 974 (9th Cir. 2002).

"Being aware of the freedom to depart, and in fact departing after questioning at a

law enforcement office, suggest that the questioning was noncustodial."  Crawford,

372 F.3d at 1060.

A.    The January 4, 2009 DOH letter

Defendant argues that because the DOH suspected him of violating

hazardous waste laws prior to sending their January 4, 2009 letter, and the letter

stated that Defendant would be subject to $10,000 per day fines for failing to

respond, Miranda warnings were necessary before Defendant submitted a response.

(Mot. at 7.)

Defendant was not in custody for Miranda purposes when he

responded to the DOH's January 4, 2009 letter.  The January 4, 2009 letter was just

that, a letter.  Further, the letter was addressed to apparent counsel for Defendant

and receipt of the letter did not serve to deprive Defendant of any freedom of

action.  In responding to the letter, Defendant was free to consult with counsel—or

anyone—because he was not placed under arrest or otherwise physically

20

restrained.  Defendant answered the letter of his own volition about two weeks after receipt.  There is no language that indicating that Defendant would be taken into or was even under criminal investigation despite the letter's statement that Defendant would face civil penalties for failing to answer.  In fact, Defendant's indictment did not issue until September 2008.  Therefore, Defendant was not in custody when he responded to the DOH's January 4, 2008 letter.

For the reasons above, the Court finds that <u>Miranda</u> does not apply to Defendant's letter in response to the DOH's January 4, 2008 letter.  Accordingly, the Court DENIES Defendant's motion to suppress Defendant's letter in response.

B.    The May 11, 2008 EPA interview

Defendant also argues that <u>Miranda</u> warnings were required prior to his statements in his May 11, 2008 interview with EPA special agents because the EPA criminal investigators knew, or had cause to suspect, that Defendant had violated hazardous waste laws.   (Mot. at 7.)

Defendant was not in custody for <u>Miranda</u> purposes during the May 11, 2008 interview with the EPA Special Agents.  Defendant was questioned at his home on a Sunday at 3:41 p.m. by two agents.  (Mot., Ex. D at 1; testimony of Jan Yukomoto, formerly Jan Valenti.) EPA Special Agent Guerra knocked on Defendant's door and asked to talk to Defendant about "some business matters,"

specifically "related to [the Special Agent's] job, environmental matters."  (Mot.,

Ex. D at 1.)  The Special Agents stated they were with the EPA, CID.  (<u>Id.</u>)

Defendant invited the officers inside, but Special Agent Guerra asked if they could

speak outside and Defendant agreed to speak on his lanai (balcony).  (<u>Id.</u>; Hearing,

testimony of  Jan Yukomoto & Ex. 20.)  No guns or handcuffs were displayed,

Defendant was never placed under arrest, and he remained free after the interview

was over and was free to terminate the interview at any time and go back inside his

home.  (Opp'n at 8.)

      Prior to the interview, Special Agent Guerra informed Defendant that

he was there regarding Martin Van Lines, Curtis Crabbe, Lily Galapon and that he

had read Defendant's prior letter to the DOH.  (Mot., Ex. D at 2.)  Special Agent

Guerra told Defendant that he was a federal officer and that it was a felony to lie in

response to any of their questions.  (<u>Id.</u>)  Defendant stated that he understood. (<u>Id.</u>)

Defendant proceeded to voluntarily answer Special Agent Guerra's questions

without threat or prompting. (<u>Id.</u> 2-23.)

      In the middle of the interview, Special Agent Guerra informed

Defendant of federal law regarding transportation of hazardous waste without a

manifest.  (<u>Id.</u> at 23-24.)  Although Special Agent Guerra did not state that he was

investigating Defendant on that ground, he asked Defendant multiple questions

regarding his contact and certification regarding hazardous waste and again

informed Defendant it was a felony to lie to a federal agent.  (<u>Id.</u> at 23-26.)

Defendant denied that he had transported hazardous waste and denied that he was

anything but truthful.  (<u>Id.</u> at 24-26.)

Twice, Special Agent Guerra tried to end the interview, but

Defendant wished to supply more information.  (<u>Id.</u> at 38, 41.)  The EPA Special

Agents left cordially, and Defendant offered to help anytime.  (<u>Id.</u> at 43.)  Under

the circumstances as described, <u>Miranda</u> simply does not apply.  <u>See</u> <u>Beckwith v.

United States</u>, 425 U.S. 341, 345-47 (1976) (<u>Miranda</u> warnings not required

because IRS agents conducted cordial interview of taxpayer at home).

First, the Special Agents did not use language indicating that

Defendant was in custody or even formally under investigation for a crime.  The

agents walked up to Defendant's home and asked to speak to him.  Second,

Defendant was in his own home, apparently his front yard, and was not placed

under arrest or otherwise physically restrained.  Defendant was willing and eager

to keep talking to the officers and at no point refused to answer questions or asked

to terminate the interview.  Third, Defendant was not confronted with any evidence

of guilt.  The transcript of the interview shows that the Special Agents were trying

to ascertain what had occurred, and Defendant's level of knowledge regarding

hazardous waste handling and transportation.  Fourth, the interview lasted under an hour.  Fifth, there is absolutely no evidence that any pressure was exerted on Defendant in order to detain him; Defendant kept talking to the Special Agents of his own volition as shown by the willingness of his responses and his desire to provide information beyond the questions asked.  Finally, the Special Agents left Defendant at his home with no indication that he was to be investigated, charged, or arrested with any crime.  In conjunction, these facts establish that Defendant was not in custody at any time during the May 11, 2008 interview with the EPA Special Agents.

For the reasons stated above, the Court finds that <u>Miranda</u> does not apply to Defendant in the May 11, 2008 interview with the EPA Special Agents. Accordingly, the Court DENIES Defendant's motion to suppress Defendant's statements to the DOH and EPA.

## CONCLUSION

For the reasons stated above, the Court DENIES Defendant's Motion to Suppress Evidence and Statements. (Doc. # 67.)

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, December 14, 2009.

_____
David Alan Ezra
United States District Judge

United States v. Swift, CR. NO. 08-00577  DAE; ORDER DENYING
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS